**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez (LR6767)
8 Kings Highway West
Haddonfield, NJ 08033
Telephone: (856) 795-9002
Facsimile: (856) 795-9887
*Liaison Counsel*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE MERCK & CO., INC. SECURITIES, DERIVATIVE & "ERISA" LITIGATION** | **MDL NO. 1658 (SRC)** |
| **THIS DOCUMENT RELATES TO:** | Case No: 3:05-CV-01151-SRC-TJB |
| **THE CONSOLIDATED ERISA ACTION** | Case No: 3:05-CV-02369-SRC-TJB |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

**SCHATZ & NOBEL, P.C.**
Robert A. Izard
William Bernarduci
Wayne T. Boulton
One Corporate Center
20 Church Street
Hartford, CT 06103
Tel: (800) 797- 5499
Fax: (860) 493-6290
*Chair of Lead Counsel Committee*

**KELLER ROHRBACK L.L.P.**
Lynn Lincoln Sarko
Juli Farris Desper
Amy N.L. Hanson
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384
*Member of Lead Counsel Committee*

**COHEN MILSTEIN HAUSFELD & TOLL, P.L.L.C.**
Marc I. Machiz
1 South Broad Street, Suite 1850
Philadelphia, PA 19107
Tel: (215) 825-4010
Fax: (215) 825-4001

Bruce F. Rinaldi
Daniel W. Sigelman
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
*Member of Lead Counsel Committee*

**SCHIFFRIN & BARROWAY, LLP**
Joesph H. Meltzer
Tobias L. Milrood
Katherine B. Bornstein
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
*Member of Lead Counsel Committee*

For their Consolidated Amended Class Action Complaint for Violations of the Employee Retirement Income Security Act (the "Complaint"), Plaintiffs allege as follows:

## I. INTRODUCTION

1.     This is a class action brought by participants in the Merck & Co., Inc. Employee Savings & Security Plan (the "Salaried Plan"), the Merck & Co., Inc. Employee Stock Purchase & Savings Plan (the "Hourly Plan"), the Merck Puerto Rico Employee Savings & Security Plan (the "Puerto Rico Plan") and the Merck-Medco Managed Care, LLC 401(k) Savings Plan (the "Medco Plan") (collectively the "Plans"), pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the fiduciaries of the Plans for the violations of ERISA.

2.     The Salaried and Hourly Plans are sponsored by Merck & Co., Inc. ("Merck" or the "Company"), the Puerto Rico Plan is sponsored by Merck Sharp & Dohme Quimca De Puerto Rico ("Merck Sharp") and the Medco Plan is sponsored by Merck-Medco Managed Care, LLC ("Merck-Medco").

3.     Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence and diligence in administering the Plans and the Plans' assets during the period October 1, 1998 through September 30, 2004 (the "Class Period").

4.      During the Class Period, Defendants failed to take action to protect the Plans from misrepresentations and omissions regarding the health and financial risks associated with Vioxx, Merck's prescription painkilling drug generically known as rofecoxib. As a result of the undisclosed risks of heart attack and stroke that were caused by Vioxx, the value of Merck stock and the Plans' investments in the Merck Common Stock Fund ("Fund" or "Stock") have been substantially diminished. Plaintiffs allege that it was imprudent for the Plans to invest in the Fund because the price of shares of the Fund was artificially inflated as a result of undisclosed material adverse information concerning the Vioxx risks. Plaintiffs also allege that Defendants breached their fiduciary duties by negligently failing to disclose material information about Vioxx necessary for participants to make informed decisions concerning the Plans' assets and benefits and investing in the Fund.

5.      Specifically, Plaintiffs allege in Count I that the Defendants who were responsible for the investment of the assets of the Plans breached their fiduciary duties to Plaintiffs and the Plans, in violation of ERISA, by failing to manage the Plans' investments in the Fund prudently and loyally. In Count II, Plaintiffs allege that the Defendants who were responsible for communicating with participants regarding the Plans' assets failed to provide participants with complete and accurate information regarding Merck sufficient to advise participants of the true risks of investing Plan assets in the Fund. In Count III, Plaintiffs allege that the Defendants who were responsible for the selection, removal, and, thus, monitoring of the Plans' other fiduciaries failed to monitor the performance of their fiduciary appointees properly and to remove and replace those whose performance was inadequate. In Count IV, Plaintiffs allege that Defendants

breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.  Finally, in Count V, Plaintiffs state a claim against Merck for knowing participation in the fiduciary breaches alleged below.

6.      This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other monetary relief.

7.      As a matter of substantive law, ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity on behalf of the Plans for losses suffered by the Plans as a result of breaches of fiduciary duty.  Since an appropriate procedural vehicle to assert such claims is a class action pursuant to Fed. R. Civ. P. 23, Plaintiffs also bring this action as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period.

8.      Because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are, by necessity, made upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct sufficient discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support their claims.

## II.  JURISDICTION AND VENUE

9.      **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

10.     **Personal Jurisdiction.**  ERISA provides for nation-wide service of process.  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New Jersey.

11.     **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## III.  PARTIES

A.      **Plaintiffs**

12.     **Plaintiff Cynthia Campbell ("Campbell ")** is a resident of the State of Ohio and was at all relevant times and is a participant in the Medco Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  She worked for Merck-Medco Managed Care, LLC (renamed Medco Health Solutions, Inc. as of May 21, 2002 and spun-off from Merck on August 29, 2003) ("Merck-Medco") from January 1994 through June 2004. During the Class Period, as a result of her and Merck-Medco's contributions, Campbell invested in shares of the Merck Common Stock Fund in her Plan account.

4

13.     **Plaintiff Robert Cimato ("Cimato")** is a resident of the State of New Jersey and was at all relevant times and is a participant in the Salaried Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  He worked for Merck from approximately 1974 through the present.   During the Class Period, as a result of his and the Company's contributions, Cimato invested in shares of the Merck Common Stock Fund in his Plan account.

14.     **Plaintiff Robert Mortensen ("Mortensen")** is a resident of the State of Virginia and was at all relevant times and is a participant in the Hourly Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  He worked for Merck from May 27, 1996 to the present.  During the Class Period, as a result of his and the Company's contributions, Mortensen invested in shares of the Merck Common Stock Fund in his Plan account.

15.     **Plaintiff Blossom Smith ("Smith")** is a resident of the State of Maryland and was at all relevant times and is a participant in the Salaried Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  She worked for Merck from May 1998 through September 2004.  During the Class Period, as a result of her and the Company's contributions, Smith invested in shares of the Merck Common Stock Fund in her Plan account.

**B.     Defendants**

16.     The Defendants are identified in paragraphs 17 to 27 below.  All of the Defendants are fiduciaries of the Plans within the meaning of ERISA, as is explained below in Section V ("Defendants' Fiduciary Status"), and all of them breached their fiduciary duties in various ways as is explained in Section IX ("Causes of Action").

17.     **Defendant Merck** is a New Jersey Corporation with its principal place of business located at One Merck Drive, Whitehouse, NJ 08889-0100.

18.     **Defendant Merck-Medco Managed Care, LLC ("Merck-Medco")** was a limited liability company and wholly-owned affiliate of Merck. As of May 21, 2002, Merck-Medco was re-named Medco Health Solutions, Inc. and spun-off from Merck on August 29, 2003.

19.     **Defendant Raymond V. Gilmartin ("Gilmartin")** was, at all times during the Class Period, the Chief Executive Officer, President and Chairman of the Board of Directors of Merck. Gilmartin also served as a member of the Management Committee, as a director of the Company from 1994 to 2005 and as the Chairperson of the Executive Committee during the Class Period. Gilmartin retired from these positions on or about May 5, 2005.

20.     **Defendant Dr. Edward M. Scolnick ("Scolnick")** was the executive Vice President for Science and Technology of Merck and President of Merck Research Laboratories. Scolnick served as a director of the Company from 1997 to 2002 and served as a member of the Merck Management Committee and member of the Management Pension Investment Committee (the "MPIC") from 1997 until 2002.

21.     **Defendant Judy C. Lewent ("Lewent")** was at all times during the Class Period, the Executive Vice President and Chief Financial Officer of Merck. Lewent served as a member of the Merck Management Committee, the Merck-Medco Board of Managers and as a member of the MPIC during the Class Period.

22.     **Defendant Kenneth C. Frazier ("Frazier")** was Senior Vice President and General Counsel from 1999 to the present, Vice President and Deputy General

6

Counsel during 1999; Vice President, Public Affairs and Assistant General Counsel in 1998. Frazier served as a member of the Merck Management Committee and a member of the Merck-Medco Board of Managers during the Class Period.

23. **Members of the Merck Board of Directors (the "Board").** The Merck Board of Directors is the governing body of Merck under its charter, its bylaws, and applicable New Jersey law. The Board appointed the members of a subcommittee of the Board, the Compensation and Benefits Committee (the "CBC"), through which the Board had the authority to appoint, remove and accept the resignation of members of the Management Pension Investment Committee (the "MPIC"). In addition to Defendants Gilmartin and Scolnick, the members of the Board during the Class Period included:

(a) **Defendant H. Brewster Atwater, Jr. ("Atwater")** served as a director of the Company from 1988 until 2001 and served as the Chairperson of the Compensation and Benefits Committee and as a member of the Finance and Executive Committees during the Class Period.

(b) **Defendant Sir Derek Birkin ("Birkin")** served as a director of the Company from 1992 until 2000 and served as a member of the Audit Committee and the Committee on Directors during the Class Period.

(c) **Defendant Lawrence A. Bossidy ("Bossidy")** served as a director of the Company from 1992 to the present, and served as the Chairperson of the Compensation and Benefits Committee, and as a member of the Corporate Governance Committee, the Executive Committee, the Finance Committee and the Committee on Directors during the Class Period.

(d)     **Defendant William G. Bowen ("Bowen")** served as a director of the Company from 1986 to the present, and served as a member of the Compensation and Benefits Committee, the Executive Committee, the Public Policy and Social Responsibility Committee and the Chairperson of the Corporate Governance Committee and the Committee on Directors during the Class Period.

(e)     **Defendant Erskin B. Bowles ("Bowles")** served as a director of the Company from April 2001 until October 2001 during the Class Period.

(f)     **Defendant Johnetta B. Cole ("Cole")** served as a director of the Company from 1994 to the present and served as a member of the Compensation and Benefits Committee, Finance Committee and the Public Policy and Social Responsibility Committee during the Class Period.

(g)     **Defendant William M. Daley ("Daley")** served as a director of the Company from 2002 to the present and served as a member of the Compensation and Benefits Committee and the Public Policy and Social Responsibility Committee during the Class Period.

(h)     **Defendant Carolyn K. Davis ("Davis")** served as a director of the Company from 1989 until 2000 and served as a member of the Executive Committee and Audit Committee during the Class Period.

(i)     **Defendant Lloyd C. Elam ("Elam")** served as a director of the Company from 1973 until 2001 and served as a member of the Compensation and Benefits Committee and the Executive Committee during the Class Period.

8

(j)      **Defendant Charles E. Exley, Jr. ("Exley")** served as a director of the Company from 1988 until 2000 and served as the Chairperson of the Audit Committee and served as a member of the Finance Committee during the Class Period.

(l)      **Defendant Carleton S. Fiorina ("Fiorina")** served as a director of the Company from 1999 until 2000 and served as a member of the Audit Committee during the Class Period.

(m)     **Defendant Niall FitzGerald ("FitzGerald")** served as a director of the Company from 2000 to 2002 and served as a member of the Finance Committee during the Class Period.

(n)     **Defendant William B. Harrison ("Harrison")** served as a director of the Company from 1999 to the present and served as member of the Public Policy and Social Responsibility Committee during the Class Period.

(o)     **Defendant William N. Kelly ("Kelly")** served as a director of the Company from 1992 to the present and served as a member of the Compensation and Benefits Committee, the Audit Committee, the Corporate Governance Committee, the Committee on Directors and as the Chairperson of the Research Committee during the Class Period.

(p)     **Defendant Hedi G. Miller ("Miller"),** on information and belief served as a director of the Company from 2000 to 2005 and served as the Chairperson of the Audit Committee and as a member of the Finance Committee during the Class Period.

(q)     **Defendant Thomas E. Shenk ("Shenk")** served as a director of the Company from 2001 to the present and served as a member of the Research

Committee, Audit Committee and the Public Policy and Social Responsibility Committee during the Class Period.

(r) **Defendant Anne M. Tatlock ("Tatlock")** served as a director of the Company from 2000 to the present and served as the Chairperson of the Finance Committee and as a member of the Corporate Governance Committee during the Class Period.

(s) **Defendant Samuel O. Thier ("Thier")** served as a director of the Company from 1994 to the present and served as a member of the Executive Committee, Research Committee, Corporate Governance Committee, Audit Committee and the Chairperson of the Public Policy and Social Responsibility Committee during the Class Period.

(t) **Defendant Dennis Weatherstone ("Weatherstone")** served as a director of the Company from 1988 to 2001 and served as the Chairperson of the Finance Committee and as a member of the Committee on Directors during the Class Period

(u) **Defendant Wendell P. Weeks ("Weeks")** served as a director of the Company from 2004 to the present and served as a member of the Audit Committee and the Finance Committee during the Class Period.

(v) **Defendant Peter C. Wendell ("Wendell")** served as a director of the Company from 2003 to the present and served as the Chairperson of the Audit Committee and as a member of the Research Committee during the Class Period.

24. As is explained in more detail below, the Board had certain appointment and oversight responsibilities with respect to the Plans. The Board and its members listed

above, including Defendants Gilmartin and Scolnick are referred to as the "Merck Director Defendants."

25.     **Members of the Management Pension Investment Committee (the "MPIC").**  The MPIC was a committee responsible for selecting and monitoring investments made by the Plans.  The MPIC was established on December 5, 1981 by Special Resolution of the Merck Board of Directors No. 84-1981.

26.     Upon information and belief, in addition to Scolnick and Lewent, the following individuals were members of the MPIC during the Class Period:

  (a)    **Defendant Marcia J. Avedon ("Avedon")**, Senior Vice President, Human Resources, and Treasurer, Merck (appointed on March 23, 2004, added as the fourth committee member).

  (b)    **Defendant Caroline Dorsa ("Dorsa")**, Vice President and Treasurer, Merck.

  (c)    **Defendant Dr. Bradley T. Sheares ("Sheares")**, President, U.S. Human Health (replaced Scolnick on November 20, 2002).

  (d)    **Defendants John and Jane Doe 1-10.**  Plaintiffs do not currently know the identity of all the MPIC members during the Class Period.  Therefore, some of the members of the MPIC are named fictitiously, as Defendants John and Jane Doe 1-10.  Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

27.     The members of the MPIC (Defendants Avedon, Dorsa, Lewent, Scolnick, Sheares and John and Jane Does 1-10) are referred to as the "MPIC Defendants."

## IV.  THE PLANS

### A.      Nature of the Plans

28.      The Plans are "employee pension benefit Plan[s]" within the meaning of ERISA§ 3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, they are "eligible individual account Plan[s]" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and are also "qualified cash or deferred arrangements" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).  While the Plans are not parties to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plans, pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

29.      At all relevant times, the Plans had two separate components: (1) a contributory portion, which consisted of participant contributions, and (2) a matching component, which consisted entirely of employer contributions.

### B.      The Plan Documents

30.      An employee benefit plan, including the Plans here, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. 1102(a)(1).  During the Class Period, the Plans were maintained under the following instruments:

- the Merck & Co., Inc. Employee Savings and Security Plan, amended and restated as of January 1, 1997 (the "Salaried Plan");

- the Merck & Co., Inc. Employee Stock Purchase and Savings Plan, amended and restated as of January 1, 1997 (the "Hourly Plan");

- the Merck Puerto Rico Employee Savings Plan, effective as of July 1, 1997 (the "Puerto Rico Plan"); and

- the Merck-Medco Managed Care, LLC 401(k) Savings Plan, As Amended and Restated as of January 1, 1998 (the "Medco Plan").

31.    As required by ERISA, the Plan Administrators for the Plans, upon information and belief, provided every participant with a Summary Plan Description ("SPD").

32.    ERISA and the Internal Revenue Code require that Plan Administrators file a Form 5500 with the Department of Labor and the Department of the Treasury, which, upon information and belief, were filed by the Plans' Administrators.

33.    The assets of an employee benefit Plan, such as the Plans, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a).

34.    During the Class Period, the assets of the Salaried and Hourly Plans were held in trust by Fidelity Management Trust Company ("Fidelity") pursuant to a Trust Agreement dated December 15, 1989 (the "Salaried and Hourly Plan Trust Agreement").

35.    During the Class Period, the assets of the Medco Plan were held in two trusts. Prior to January 1, 2003, the assets of the Medco Plan were commingled in a Master Trust with the assets of the Salaried Plan and the Hourly Plan. However, on December 31, 2002, the Medco Plan was separated from the Master Trust in preparation for the planned spin-off of Merck-Medco. On January 1, 2003, Merck-Medco established a separate trust with Fidelity and transferred the Medco Plan assets from the Master Trust to the new trust.

36.    During the Class Period, the assets of the Puerto Rico Plan were held in trust by Banco Popular De Puerto Rico Trust pursuant to a Trust Agreement dated July 23, 1997 (the "Puerto Rico Plan Trust Agreement").

C.    **Purpose of the Plans**

37.    The Salaried, Hourly and Puerto Rico Plans each stated the same purpose:

The [respective Plan] is a profit-sharing plan designed to provide an opportunity for employees to become stockholders of Merck & Co., Inc. and to encourage them to save on a regular basis by setting aside part of their earnings.

( Salaried Plan, Hourly Plan Puerto Rico Plan, § 1.1.).

38.    The Medco Plan stated "The Plan is a profit sharing plan designed to provide an opportunity for employees to save on a regular basis by setting aside part of their earnings." (Medco Plan, Introduction).

D.    **Plan Contributions**

1.    **Participant Contributions**

39.    The Salaried, Hourly and Puerto Rico Plans contained a pre-tax savings (a 401(k)) feature and an after-tax savings feature, which permitted participants to contribute on a pre-tax or after-tax basis.  However, the Medco Plan only permitted participants to contribute on a pre-tax basis.

a.  **Salaried Plan**

40.    For the Salaried Plan, participants were able to contribute from 2% to 15% of their base pay (Salaried Plan, § 5.2). Non-highly compensated employees -- those who earned less than $85,000 in 2001 and $90,000 in 2002 -- could contribute a between 2% and 18% of their base pay.  The participants' after-tax and pre-tax contributions vested immediately and were nonforfeitable. (Salaried Plan, § 5.10).

b.  **Hourly Plan**

41.     For the Hourly Plan, participants were able to contribute from 2% to 15% of their base pay, except that after-tax contributions could not exceed 10% of the participant's base pay. (Hourly Plan, § 5.2). Non-highly compensated employees -- those who earned less than $85,000 in 2001 and $90,000 in 2002 -- could contribute between 2% and 18% of their base pay, except that after-tax contributions could not exceed 10% of the participant's base pay. The participant's after-tax and pre-tax contributions vested immediately and were nonforfeitable. (Hourly Plan, § 5.11). According to the 2003 Update to the 2002 Annual Report, "[e]ffective, July 1, 2003, non-highly compensated, hourly employees represented by the IUC [could] also contribute a maximum of 25% of base pay plus Cost of Living Adjustment to the Plan."

### c.  Puerto Rico Plan

42.     For the Puerto Rico Plan, participants were able to contribute from 2% to 15% of their base pay, except that pre-tax contributions could not exceed 10% of the participant's base pay. (Puerto Rico Plan, § 5.2). The participant's after-tax and pre-tax contributions vested immediately and were nonforfeitable. (Id. at § 5.11).

### d.  Medco Plan

43.     For the Medco Plan, participants were able to contribute from 1% to 15% of their base pay. Howeverhighly compensated employees could not contribute more than 10% of their base pay.

## 2.   Employer Contributions

44.     Merck offered various company matching contributions depending on the Plan. Each of the Plans' matching contributions are reviewed below:

### a.  Salaried Plan

45.     For the Salaried Plan, Merck matched 75% of employee pre-tax and after-tax contributions up to 4.5% of the participant's base pay. (Salaried Plan, § 6.1).

46.     The Company match was thereafter increased in that the 2002 Annual Report indicates that, with respect to the Salaried Plan, "the Company matched 75% of employee contributions up to 6% of base pay per pay period."

47.     The Company match was invested in the Merck Company Stock Fund as follows:  with respect to Salaried Plan participants under age 50, 50% of the matching contribution was required under the Plan to be automatically invested in the Merck Common Stock Fund and 50% was invested in the funds to which the participant currently contributed.  (Salaried Plan, §§ 8.1 and 8.2).  If the participant was over age 50, he or she could invest the entire match in any fund (including the Merck Common Stock Fund).  (Id.)  However, the allocation remained the same (i.e. the age 50+ participant still received the 50% of the Company match in the Merck Company Stock Fund).  If the age 50+ participant wanted to change the allocation, he/she had to make a separate designation.

48.     The Company match in the Salaried Plan immediately vested and was nonforteitable.  (Salaried Plan, § 6.4.).

### b. Hourly Plan

49.     Prior to April 1, 1999, the Company matched 50% of a participant's after-tax and pre-tax contributions up to the lesser of (a) 2½% of a participant's base compensation or (b) that portion of the monthly cap set forth in the Collective Bargaining Agreement ("CBA") covering the participant.  (Hourly Plan, § 6.1).

50.     As of April 1, 1999, the maximum Company match varied under the CBAs between 50% and 60% of the first 6% of a participant's base compensation. (Hourly Plan, § 6.1).

51.     The Merck Employee Savings Plan 2002 Annual Report (the "2002 Annual Report") indicates that with respect to the Hourly Plan, "the Company matched 60% of employee contributions up to 6% of base pay plus Cost of Living Adjustment per pay period."

52.     According to the 2003 Update to the 2002 Annual Report, "[e]ffective July 1, 2003, the Company matching contributions for IUC-represented employees increased from 60% to 65% of employees' contribution up to 6% of base pay plus Cost of Living Adjustment."

53.     The Company match for the Hourly Plan was invested in the Merck Company Stock Fund under similar conditions as set forth in the Salaried Plan.  With respect to Hourly Plan participants under age 50, 50% of the matching contribution was required under Plan documents to be automatically invested in the Merck Common Stock Fund and 50% was invested in the funds to which the participant currently contributed. (Salaried Plan, §§ 8.1 and 8.2).  If the participant was over age 50, he or she could invest the entire match in any fund (including the Merck Common Stock Fund).  (Id.)  However,

allocation remained the same (i.e. the age 50+ participant still received the 50% of the Company match in the Merck Company Stock Fund). If the age 50+ participant wanted to change the allocation, he/she had to make a separate designation

54. The Company match under the Hourly Plan immediately vested and was nonforfeitable.

### c. Puerto Rico Plan

55. For the Puerto Rico Plan, the Company matched 50% of each after-tax contribution and pre-tax contribution up to 2½ % of each participant's base compensation. (Puerto Rico Plan, § 6.1).

56. The Company matching contribution under the Puerto Rico Plan was thereafter increased in that the 2002 Annual Report indicates that "the Company matched 50% of employee contributions up to 5% of base pay per pay period.

57. Under the Puerto Rico Plan, the matching contribution was required under Plan documents to be invested entirely in the Merck Common Stock Fund and could not be reallocated into any other investment option. (Puerto Rico Plan, § 8.1).

58. The Company match under the Puerto Rico Plan immediately vested and was nonforfeitable.

### d. Medco Plan

59. With respect to the Medco Plan, the Company matched 100% of participant contributions up to 3% of the participant's base compensation per pay period and 50% of participant contributions in excess of 3% of base pay up to 6% of pay per base pay period. (Medco Plan, § 5.1). However, the company matching contribution

could not exceed 4.5% of each participant's base compensation applicable to the pay period in which the participant made the pre-tax contribution.

60.     Under the Medco Plan, the company matching contribution was paid to the Trustee (Medco Plan, § 5.4), and participants could direct the Company matching contributions into any of their available investment options.

61.     Under the 1998 Medco Plan, the company matching contribution did not immediately vest. The match vested upon the earliest occurrence of the following events: (a) attainment of normal retirement age, (b) the participant's death, (c) termination of employment due to disability or (d) termination of the Plan. (Medco Plan, § 5.3).

62.     The Medco Plan also established a schedule for vesting based on a participant's year of employment:

| Years of Employment | Vesting Percentage |
|---|---|
| Less than 2 | Zero |
| At least 2 but less than 3 | 25% |
| At least 3 but less than 4 | 50% |
| At least 4 but less than 5 | 75% |
| 5 or more | 100% |

(Medco Plan, § 5.3).

63.     As of the beginning of 2005, the Medco Plan abandoned its vesting schedule and allowed all contributions to vest immediately. Effective January 1, 2005, "Company contributions held in participants' accounts and all Company matching contributions vest immediately." (2004 Form 11-K, dated June 10, 2005, at 7).

### E.    Investment Options

64.     Effective January 1, 2002, the Salaried, Hourly and Puerto Rico Plans, offered 21 investment options (20 mutual funds and the Merck Common Stock Fund). On information and belief, the Medco Plan offered its participants similar investment options.

65.     The Merck Common Stock Fund holds the Plans' shares of Merck stock. The Fund was designed to invest primarily, not exclusively, in Merck stock and expressly allows investment in cash and other short-term investment options.

66.     Throughout the Class Period, over a billion dollars of Plan assets was invested in the Fund.

### F.    The Plans' ESOP Status

67.     In addition to being an "employee pension benefit plan," as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), the Salaried Plan purports to be an Employee Stock Ownership Plan ("ESOP"). Plan materials indicate that, as of January 15, 2001, the Merck Common Stock Fund in the Salaried Plan was converted into an Employee Stock Ownership Plan ("ESOP").

68.     An ESOP is an ERISA plan that invests primarily in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). For a plan to qualify as an ESOP, the plan must meet numerous requirements set forth in both ERISA and the Internal Revenue Code. Based on documents reviewed to date, it is not apparent that any of the Plans qualify as an ESOP. Even if the Plans do qualify as an ESOP, the Plan fiduciaries may not invest in employer securities regardless of the circumstances. To the contrary, while the duty to diversify does not apply to company stock investments *per se* in an ESOP, the fiduciaries

remain bound by the other core ERISA fiduciaries duties, including the duties to act loyally, prudently and for the exclusive purpose of providing benefits to Plan participants.

## V. DEFENDANTS' FIDUCIARY STATUS

69.    ***Named Fiduciaries***.  ERISA requires every Plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the Plans instrument is automatically a named fiduciary, and in the absence of such a designation, the Sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

70.    ***De Facto Fiduciaries***.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent:  "(i) he exercises any discretionary authority or discretionary control with respect to management of such Plans or exercises any authority or control with respect to management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such Plans, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such Plans."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

71.    Each of the Defendants was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and its participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

72.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plans, and the Plans' investments

solely in the interest of the Plans' participants and beneficiaries and with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of a like character and with like aims.

73.     Instead of delegating fiduciary responsibility for the Plans to external

service providers, Merck chose to comply with the requirement of ERISA § 402(a)(1) by

assigning the appointment and removal of fiduciaries to its CEO, and members of its

Board of Directors.  These persons and entities in turn selected Merck officers,

employees, and agents to perform relevant fiduciary functions.  Although the Plans had

an institutional trustee unrelated to Merck, the Trust Agreement required the trustee to

take directions from Merck.

**A.     Merck's Fiduciary Status**

74.     The 2003 Form 5500 for the Salaried and Hourly Plans indicates that

Merck is the Plan Administrator of both the Salaried and Hourly Plans.  (Salaried Plan

2003 Form  Annual Return/Report filed with the Department of Labor ("DOL"), and the

Internal Revenue Service ("IRS") dated October 15, 2004, Merck & Co., Inc.); (Hourly

Plan 2003 Form 5500 dated October 15, 2004).

75.     Under the terms of the Salaried and Hourly Plans, Merck was designated

"the administrator of the Plan[s] only to the extent that such term is used in ERISA, and

in any regulations issued thereunder." (Salaried Plan, § 15.1); (Hourly Plan, § 15.1

Hourly Plan).

76.     The "Administrative Information" section within the Summary Plan

Description for the Salaried Plan also provided that Merck was the Plan Administrator:

> The plan administrator for each of the plans under the Merck Benefits
> Program is Merck & Co., Inc.
>
> \* \* \*
>
> Merck & Co. Inc., as Plan Administrator, has the exclusive
> discretionary authority to construe and interpret the plans, to decide all
> questions of eligibility for benefits and to determine the amount of
> such benefits, and its decisions on such matters are final and
> conclusive. Merck & Co., Inc., as plan administrator, has reserved the
> right to delegate its discretionary authority to construe and interpret the
> plans, to decide all questions of eligibility for benefits, and to
> determine the amount of such benefits to a representative . . . and such
> representative's decisions on such matters are final and conclusive.

77.     The "Administrative Information" section within the Summary Plan
Description for the Hourly Plan also provided that Merck was the Plan Administrator.

78.     Under Section 14.1 of the Salaried and Hourly Plans, Merck was
responsible for entering into a trust agreement with the Trustee to be designated by the
Management Pension Investment Committee (the MPIC"). The Trust Agreement for the
Salaried and Hourly Plans provided Merck with the authority to remove the Trustee and
amend, modify or terminate the agreement.

79.     Upon information and belief, at all times during the Class Period, Merck's
SEC filings were incorporated into and a part of the SPDs, the Prospectus and/or the
Form S-8 registration statements.

80.     Upon information and belief, Merck was responsible for preparing and
distributing communications to participants regarding the Plans, including the preparation
of (a) the Summary Plan Descriptions ("SPDs"), (b) the Prospectus, (c) the Form S-8
registration statement, (d) the SEC filings incorporated by reference into the SPDs, the
Prospectus and the Form S-8 registration statements and (e) other material related to the
Plans.

81.     Merck exercised discretionary authority with respect to the Plans by
determining or participating in decisions about the substantive content of (a) the SPDs,
(b) the Prospectus, (c) the Form S-8 registration statements, (d) the SEC filings
incorporated by reference into the SPDs, the Prospectus and the Form S-8 registration

23

statements and (e) any other Plan material or communications, all of which were intended to communicate to participants information necessary for participants to manage their retirement benefits under the Plans.

82.    Merck was not required under the Plans to cause the Plans to offer the Fund as an investment option, or to incorporate all of Merck's SEC filings into the Plan documents, but once it elected to do so, it made the disclosures in those documents to the Plan participants in a fiduciary capacity.

83.    Merck was also a fiduciary to the extent that its employees served on Plan committees within the scope of their employment and Merck possessed and exercised control over their conduct as set forth in paragraphs 85, 87, 88.  In particular, Merck personnel participated in (a) appointing and monitoring those who administered the Plans, (b) administering the Plans and Plan assets, (c) monitoring the Plans' investment options and (d) determining the substantive content of Plan communications, including SEC filings that, upon information and belief, were incorporated by reference into the Plan documents.

84.    The Merck Director Defendants, the CBC Defendants and the MPIC Defendants were Merck's agents because these committee members acted on behalf of Merck.  On information and belief, all the MPIC Defendants were employees of Merck who acted at the direction and control of and in the ordinary course of their duties with Merck.  Based on these facts, Merck had control over the actions of the MPIC and its members and is liable for their actions.

85.    Merck was also a fiduciary during the Class Period because the members of its Board of Directors were fiduciaries during that time, and the Board is, by definition, an agent of the corporation.

86.    Upon information and belief, through the express and/or implied use of its power to compensate, demote and discharge individuals working for Merck or its subsidiaries, Merck made it clear, to all those who both served the Plans in a fiduciary